# EXHIBIT 1

# In The Matter Of:
*Dwight Hurd v.*
*Dr. Charles Lye, et al.*

---

*Abby Stout*
*June 26, 2020*

---

*WV Depos*
*2413 East Pike Street, Suite 119*
*Clarksburg, West Virginia 26301*

Original File Abby Stout.prn

Min-U-Script® with Word Index

1    you ever gotten angry at an inmate?
2         A.    No.
3         Q.    Not at any point?
4         A.    I mean, if we get angry at them, then they
5    win.  They win the situation.  They get the best of us.
6    So it's just better to keep professional.
7         Q.    Do you remember who Dwight Hurd is?
8         A.    Yes.
9         Q.    And what is your impression of Mr. Hurd?
10        A.    I mean, he was a calm individual.
11        Q.    What does that mean?
12        A.    He didn't really talk to any of the officers.
13   He didn't bother us unless he, you know, needed
14   paperwork or something like that.
15        Q.    So prior to the October 21st, 2017 incident,
16   do you recall having any interactions with Mr. Hurd?
17        A.    Nothing that wasn't normal, day-to-day
18   interactions, like yelling for chow or you know, telling
19   the inmates that it was rec time or anything like that.
20        Q.    And had he ever presented any problems or
21   trouble -- caused any trouble for you before the
22   21st incident, the October 21st --
23        A.    Not that I can recall.  No.
24        Q.    What do you remember about the incident on

1  October 21st, 2017?
2       A.   Well, I remember getting called to go up to
3  the unit to take him to medical to do a pre-seg check,
4  and when we got to the housing unit, I instructed
5  Inmate Hurd to come out of the cell and put his hands on
6  the wall, and he refused multiple times.
7            And Lieutenant Dodd, he attempted to place him
8  on the wall, and he seemed like he was, you know,
9  following instructions, and then he kind of ripped out
10 of Lieutenant Dodd's grip and ran.
11           And Lieutenant Dodd instructed him that he
12 needed to get on the wall, gave him multiple orders,
13 multiple warnings, you know, he was going to get sprayed
14 if he didn't comply, and he didn't listen.
15           Lieutenant Dodd attempted to spray him once,
16 and Inmate Hurd ran again.  It kind of got into, I
17 guess, a wrestling match between Lieutenant Dodd and
18 Inmate Hurd.  Inmate Hurd was on top of Lieutenant Dodd.
19           I attempted to help restrain the inmate to get
20 him off of Lieutenant Dodd by attempting to grab his
21 feet, and it did not work, so at that point, we did
22 deploy OC.
23           And then after radioing for other officers'
24 assistance, we finally did get him restrained and off

```
 1  then we approach the situation a little bit more
 2  cautious and a little bit more different.
 3       Q.   Had Mr. Hurd been informed himself of why he
 4  was going to seg?
 5       A.   No.  He actually hadn't even been told he was
 6  going to seg, because we try to get a pat-down search
 7  done prior to telling them.  That way, we know if
 8  there's anything dangerous on them or anything like
 9  that.
10       Q.   And can you recall what Mr. Hurd was saying as
11  you -- well, let me take it step by step.  You
12  approached his cell, opened the door, and directed him
13  to come out; is that correct?
14       A.   Yes.
15       Q.   Can you recall what, if anything, he said at
16  that point?
17       A.   When I asked him to put his hands on the wall,
18  he asked me why.
19       Q.   And what did you say?
20       A.   I told him that I would explain everything as
21  soon as we had a pat-down search and him in handcuffs,
22  because it was a safety measure.
23       Q.   And how did he respond to that?
24       A.   He just continued to say, why.
```

WV Depos
304-566-7800

1  Q. And as the incident progressed, can you recall
2  him asking anything else or saying anything else?
3  A. No.
4  Q. How did you perceive his demeanor during this?
5  A. I mean, he was still calm until, you know, we
6  attempted to place him on the wall.
7  Q. And once he -- once you attempted that and he
8  wasn't as calm, what did you -- how did you feel he was
9  acting?
10 A. He was acting aggressive.
11 Q. What did he do that you perceived as
12 aggressive?
13 A. I mean, refusing the order, multiple orders,
14 that, to me, perceives aggressive. There's something
15 there, there's something hiding, or there's some reason
16 he did not want a pat-down search.
17 Q. Would you agree with me that he had his hands
18 up in a position of -- I don't know what you call this
19 position, but where your hands are in the air with your
20 palms open throughout this --
21         MR. LEMASTERS: Object to form.
22         MS. MILNES: I'm sorry. I couldn't -- I
23 didn't hear that. Was that an objection?
24         MR. LEMASTERS: Yeah. Just object to

1 form.

2     A.   I would perceive that as he could be getting
3 ready to be in a fighting stance, because from here to
4 here, it's really fast.
5     Q.   And just for the record, what you did was you
6 went from your hands up at about head height with open
7 palms to your hands at chest level with closed fists; is
8 that accurate?
9     A.   Yes.
10    Q.   Do you agree with me that at no point did
11 Mr. Hurd ever move to a closed-fist stance?
12    A.   Correct. He did not, but as correctional
13 officers, we have to think of the worst and what could
14 happen and we have to prepare for that, so at any point,
15 we can -- we can take that as an aggressive stance due
16 to knowing that it can go into a fighting stance with
17 seconds, and to us, that's sort of a life-or-death
18 situation.
19    Q.   Would you agree with me that throughout the
20 incident Mr. Hurd was backing away from you and
21 Lieutenant Dodd?
22          MR. LEMASTERS: Object to the form.
23    A.   I don't think he was backing away. I think he
24 was kind of just bouncing around.

```
 1        A.   I don't.  Because I was assessing Lieutenant
 2   Dodd and Officer Tangler's injuries and -- to see the
 3   situation, if they needed help off the housing unit.
 4        Q.   Did you -- were you part of the team that
 5   transported Mr. Hurd?
 6        A.   I was.
 7        Q.   And how did that happen?
 8        A.   The two officers, Officer -- or Corporal
 9   Whitehair and I do believe Lieutenant Stevenson, picked
10   him up by the arms and took him into the elevator, and
11   we rode the elevator up to medical.
12        Q.   Who else was in the elevator, anyone?
13        A.   It was me, Corporal Whitehair, and like I
14   said, I do believe it was Lieutenant Stevenson.
15        Q.   And how were you inside the elevator?  Who was
16   where?
17        A.   I would've been to his left, in the back
18   corner.  Corporal Whitehair would've been in front of
19   him to the right, and Lieutenant Stevenson was to the
20   back of him to the right.
21        Q.   And where was Mr. Hurd?
22        A.   He was sitting on the floor.
23        Q.   I'm sorry.  Could you -- I missed what you
24   said.
```

```
 1        A.    He was sitting on the floor.
 2        Q.    Sitting on the floor.  Was he -- where within
 3   the elevator was he?
 4        A.    In the middle.
 5        Q.    And do you know why he was sitting, instead of
 6   standing?
 7        A.    He said he couldn't walk.
 8        Q.    Did you actually see him walk at any point
 9   during this period?
10        A.    No.
11        Q.    Why didn't someone get a wheelchair to
12   transport him?
13        A.    Because we had two officers that were capable
14   of carrying him by the arms.
15        Q.    Did anything happen during the elevator ride?
16        A.    No.
17        Q.    And what happened after you left the elevator?
18        A.    We escorted him to medical.
19        Q.    And what happened at medical?
20        A.    He was -- he was checked by the nurse.  His
21   vitals were checked, and then we escorted him to seg.
22        Q.    Do you recall whether he was struggling to
23   breathe while he was in medical?
24        A.    I don't recall if he was or not.
```

WV Depos
304-566-7800

1  Q. And what -- I'm sorry. I didn't mean to
2  interrupt.
3  A. But nobody that was doing the use-of-force
4  investigation talked to me.
5  Q. So you said there was a grievance
6  investigation?
7  A. Yes.
8  Q. And who conducted that? Do you know?
9  A. It would've been Sergeant Jason Reeder, and I
10 think he was a corporal at the time, Corporal -- I can't
11 -- I can remember his first name. His first name is
12 Dalton, but I can't remember his last.
13 Q. And what sorts of questions did they ask you?
14 A. Just if there had been any racial remarks or
15 if we had said anything out of line to Inmate Hurd.
16 Q. Were you all together at that point when you
17 were questioned, or did they question you separately?
18 A. They questioned us separately.
19 Q. And do you recall hearing any remarks being
20 made relating to race?
21 A. No.
22 Q. Do you ever -- did you ever hear remarks made
23 at Salem regarding race?
24 A. Not to my knowledge. No.

```
 1        Q.    Have you ever heard inmates using racial
 2   slurs?
 3        A.    They do, yes.
 4        Q.    But you've never heard any officers using
 5   those?
 6        A.    No.
 7        Q.    And after you talked to the investigators
 8   about -- you know, answered their questions, did you
 9   ever hear anything further about that?
10        A.    No.
11        Q.    Have you ever been disciplined in your role as
12   a correctional officer?
13        A.    No.
14        Q.    And have you ever been directed to receive any
15   counseling or anything along those lines?
16        A.    No.
17        Q.    Have you ever been sent home early from a
18   shift for a conduct-related issue, as opposed to a
19   staffing-based decision?
20        A.    No.
21        Q.    Have you ever been arrested for any sort of
22   criminal charge?
23        A.    No.
24        Q.    Have you ever been a party in any other type
```